Dean A. FITZGARRALD and Phyllis Fitzgarrald, Appellants,

v.

The CITY OF IOWA CITY, Iowa, and Johnson County, Iowa, Appellees.

No. 90–1845.

Supreme Court of Iowa.

Nov. 25, 1992.

Rehearing Denied Dec. 23, 1992.

William L. Meardon of Meardon, Sueppel, Downer & Hayes, Iowa City, for appellants.

David E. Brown of Hayek, Hayek, Holland & Brown, Iowa City, for appellee City of Iowa City.

J. Patrick White, County Atty., and Karen Lorenzen, Legal Intern, for appellee Johnson County.

CARTER, Justice.

Plaintiffs, Dean Fitzgarrald and Phyllis Fitzgarrald, who are landowners adjacent to the Iowa City Municipal Airport, appeal from adverse judgment in mandamus action to compel condemnation. The court of appeals concluded that a taking had occurred but that plaintiffs had not shown exhaustion of administrative remedies or the requisite "finality of taking" under the "variance" provisions of the ordinance. We granted further review of the court of appeals decision.

On June 17, 1992, this court filed an opinion deciding the issues on appeal. A petition for rehearing filed by plaintiffs was subsequently granted, and that opinion, which was never published, was withdrawn. After reviewing the record and hearing the arguments as originally presented and upon the petition for rehearing, we vacate the decision of the court of appeals. We affirm the judgment of the district court.

Plaintiffs own approximately ten acres of land adjacent to the southwest portion of the Iowa City Municipal Airport. The airport was in operation at the same location when plaintiffs purchased the property sometime in the 1940s. Throughout their ownership of this property, plaintiffs have resided in a dwelling located on the premises. In addition, they have operated a mobile home park on the property.

The property was zoned as residential subsequent to plaintiffs' purchase thereof, and the mobile home park operation has continued as a nonconforming use under that zoning classification. Plaintiffs have attempted to secure rezoning of the property so as to permit other commercial uses, but those efforts have proved unsuccessful. The most recent unsuccessful attempt to rezone the property was in 1978 when plaintiffs applied to Johnson County for rezoning to permit a motel operation.

Plaintiffs' property is located at the end of airport runway 6–24. In November 1984, the Iowa City Airport Commission undertook a project designated as "Runway 6–24 Extension Project." This project contemplated that runway 6–24 would be extended 1000 feet toward plaintiffs' property. The extension required the taking of 1.18 acres of plaintiffs' land. To help facili-

tate this project, the City of Iowa City and Johnson County in 1984 jointly adopted a zoning ordinance prescribing height and use restrictions for property surrounding the airport.

The 1984 ordinance proscribed structures from penetrating an "Approach Overlay Zone," which is a plane beginning 200 feet from the end of a runway and extending skyward at a slope of thirty-four horizontal feet to one vertical foot (34:1 slope). This "approach slope" for the proposed 1000–foot extension of runway 6–24 penetrated the plaintiffs' home and some of their ground. Preexisting structures that did not conform to the ordinance were permitted to remain without alteration as nonconforming uses.

The ordinance also provided for a "Clear Overlay Zone," which places restrictions on uses for property located beneath it. A substantial portion of plaintiffs' property is within the clear zone. The ordinance provides:

> Use limitations. No use shall be permitted in the OCL Zone in which there is connected therewith a building which according to the 1982 edition of the Uniform Building Code, has an occupancy rating of 50 square feet of floor area per person or less. In addition, the following uses shall not be permitted:
> (a) Campgrounds.
> (b) Fairgrounds.
> (c) Hospitals and institutions.
> (d) Motels and hotels.
> (e) Nursing and custodial home.
> (f) Residential uses.
> (g) Restaurants and similar eating and drinking establishments.
> (h) Sanitary landfills.
> (i) Schools, including nurseries, pre-kindergartens and kindergartens.
> (j) Stadiums.
> (k) Storage of fuel or other hazardous materials.
> (*l*) Theaters.

Exceptions and variances from the use limitations may be allowed in some situations and a special board of adjustment has been established to consider such applications. To a large extent, the ordinance incorporated restrictions already contained in Federal Aviation Administration (FAA) regulations applicable to property surrounding the airport. *See* 14 C.F.R. part 77 (1984).

In August 1986, the city initiated an eminent domain proceeding to acquire 1.18 acres of plaintiffs' property in fee for the runway extension. The award in that proceeding is the subject of an appeal in a separate action not affecting the present litigation. In December 1986, plaintiffs filed a mandamus action demanding that the city also condemn an avigation easement to permit flights over their property.[1] In October 1987, prior to adjudication of the mandamus action, the city did initiate eminent domain proceedings to obtain such an easement. That action was ultimately voided by district court order as a result of a faulty description of the interests being condemned. No further action has been taken by the city to acquire an avigation easement over plaintiffs' lands.

Ultimately, runway 6–24 was only extended 355 feet instead of the 1000–foot extension originally contemplated. The 1984 zoning ordinance was amended to accommodate this change. The primary result of these amendments was to change the height restrictions of the ordinance to reflect the shorter runway. Under the amended ordinance, plaintiffs' dwelling penetrates 6.9 feet into the specified approach slope. Like the 1984 ordinance, the amended ordinance allows plaintiffs' nonconforming uses to continue without alteration.

When the city failed to reinitiate the aborted attempt to condemn an avigation easement, plaintiffs again pressed their mandamus action. They also amended that action to allege that the zoning ordinances were so restrictive of property uses that

---

1. In *Dolezal v. City of Cedar Rapids,* 209 N.W.2d 84, 87 (Iowa 1973), we described an avigation easement as one that permits free flights over land including those so low and so frequent as to amount to a taking of property.

they constituted a regulatory taking for which compensation was due plaintiffs.

After hearing the evidence presented at the trial of the mandamus action, the district court concluded that the ordinances do not constitute a compensable taking of plaintiffs' property. The court also considered and rejected plaintiffs' claim that an avigation easement must be condemned by the airport authority because of a direct physical invasion of plaintiffs' lands by overflying aircraft. The latter claim was based on allegations that unreasonable noise and vibrations were occurring because takeoffs and landings to and from the extended runway were now more proximate to plaintiffs' property. The court found from the evidence that, in fact, there were fewer flights over plaintiffs' lands after the runway extension was completed than there were before that project was initiated.[2] Other facts relevant to the case will be considered in our discussion of the legal issues that have been presented.

## I. *The Physical Invasion Claim.*

■ We first consider plaintiffs' claim that overflying aircraft so adversely affects the use and enjoyment of their property that a taking has resulted. In this regard, we note the Supreme Court's admonition that

[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978) (citation omitted). In some circumstances, overflying aircraft may amount to a physical invasion. *See United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 1065, 90 L.Ed. 1206, 1210 (1946).

■ Mandamus is an equitable action. *Phelps v. Board of Supervisors,* 211

N.W.2d 274, 277 (Iowa 1973); Iowa Code § 661.3 (1985). Our review is thus de novo. Iowa R.App.P. 4. We tacitly recognized mandamus as a procedural device to compel condemnation of an avigation easement in *Dolezal,* 209 N.W.2d at 87–88. In that case, we recognized that an avigation easement may be required when flights are so low and so frequent as to amount to a taking of property. *Id.* at 87. Of course, every noise or interference with property as a result of overflying aircraft does not constitute a taking. Landowners must endure some level of inconvenience, discomfort, and loss of peace and quiet that can be reasonably anticipated by members of a progressive society. But, as the Minnesota court observed,

when those interferences reach the point where they cause a measurable decrease in property market value, it is reasonable to assume that, considering the permanency of the air flights, a property right has been, if not "taken or destroyed," at the very least "damaged," for which our constitution requires that compensation be paid.

*Alevizos v. Metropolitan Airports Comm'n,* 298 Minn. 471, 486–87, 216 N.W.2d 651, 662 (1974). In such cases, the right to recovery is not for the nuisance that must be endured but for the loss of value that has resulted.

■ Although some courts have concluded that the issue of whether a taking has occurred in airport overflight cases is an issue of law for the mandamus court to decide in the first instance, *see, e.g., In re Ramsey,* 31 Pa.Commw. 182, 186, 375 A.2d 886, 888–89 (1977), we believe the better rule to be that the mandamus court should only determine whether a factual issue exists that would permit a condemnation commission or a jury on appeal of an award to find an intrusion that produced a measurable decrease in the property's market value. The mandamus court may find the evidence insufficient as a matter of law to compel the summoning of a condemnation commission, but that court is simply not

---

**2.** The court of appeals apparently found that the overflights were a sufficient invasion to consti- tute a taking separate and apart from the alleged regulatory taking.

called upon to rule as a matter of law that a taking has occurred. To do so would create an undesirable issue preclusion problem in a later trial of a condemnation proceeding. It is for the condemnation commission or trial jury to fix the loss of value, if any, suffered by the property owner. *Phelps,* 211 N.W.2d at 276.

■ If some physical invasion is in fact demonstrated, there is no de minimis rule. As the Supreme Court has observed:

> [N]o matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation [for physical invasion].

*Lucas v. South Carolina Coastal Council,* — U.S. —, —, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812 (1992). The following comments of a Washington court are instructive on this point:

> [T]he balance of interest inherently struck in this type of action comes about in the following manner. If the individual is unusually sensitive, and sustains a greater injury than might be suffered by the general public from such interference, the public interest in maintaining the flights leaves him to one remedy—to sell his property and move. This is no different than it would be had his land been condemned for forced sale to the state. But whichever way the state exacts such a "sale," it must pay the individual the amount he suffers in the diminishment of the value of his land.... Such lowering of market value reflects not the personal injury to the individual, but the lesser desirability of the land to the general public....
>
> ... [W]here there is only an injury of the extent such that it should be called or labeled "incidental," no measurable or provable decline in market value could be expected traceable to the flights. Recovery would not be forthcoming, but not because of some arbitrary rule set for convenience in administration of justice, but because of an inability to prove damages according to the common and well understood rules of suit. Second, and even more significant to the balancing problem, the smaller the provable decline

in market value, the slighter the burden cast upon the public in paying for it. Surely the protection of the public interest does not entail the refusal of *small* claims on the ground that the burden to the public is not great enough to pay for!

*Martin v. Port of Seattle,* 65 Wash.2d 309, 318, 391 P.2d 540, 546–47 (1964). We accept these principles and thus accept plaintiffs' argument that, on their physical invasion claim, they were not required to try their eminent domain case in full in the mandamus action. They were only required to present enough evidence to generate a fact issue as to whether the overflying aircraft produced a measurable decrease in property value.

Plaintiffs appear to have contended at one point in the litigation that the thirty-four horizontal feet to one vertical foot approach slope constituted the flight path of aircraft over their property on takeoffs and landings. The evidence reveals, however, that the approach slope is merely a clearance zone and bears no relationship to the actual altitude of planes over the land to which the approach slope applies. The record is devoid of any evidence showing either the frequency or approximate altitudes of planes flying over plaintiffs' lands.

Defendants presented evidence that planes were taking off and landing with approximately the same frequency and altitude before and after the runway extension. Three pilots who testified for defendants indicated that after the runway was extended they altered their approach turns to runway 6–24 so as to keep farther away from plaintiffs' property. Two of these pilots conceded, however, that planes landing on runway 6–24 would now pass over plaintiffs' lands at lower altitudes as a result of the 355–foot runway extension.

■ Although plaintiff Phyllis Fitzgarrald testified as to some inconvenience from airport noise, she did not fix the frequency of such occurrences nor indicate that this occurred on a regular basis. She testified that some tenants of the mobile home park had left after the runway was extended, but admitted that she had no personal knowledge as to the reason why.

No other evidence was offered concerning loss of tenants at the park. Most significant perhaps, for purposes of plaintiffs' physical invasion claim, is the fact that the loss-of-value evidence that they presented related entirely to their regulatory taking claim. None of the witnesses at trial testified that overflying aircraft adversely affected the market value of plaintiffs' property. Consequently, we are forced to conclude that there is a deficiency of proof as to the element of "measurable decrease in market value" due to overflying aircraft. The district court correctly rejected plaintiffs' physical invasion claim, and the court of appeals erred in concluding otherwise.

## II. *The Regulatory Taking Issue.*

We next consider whether the district court was correct in deciding the regulatory taking issue adversely to plaintiffs. Although action by the state or its political subdivisions pursuant to the police power and the power of eminent domain were once thought to be separate and compartmentalized powers that did not overlap, this view has now been largely abandoned. *See* 2 A. Gaudio, *The American Law of Real Property* § 17.05, at 87–102 (1991). We have recognized the "inevitable danger" to private property that would exist if the "just compensation" requirements of the fifth amendment to the federal Constitution and article I, section 18 of the Iowa Constitution could be circumvented through the guise of police power regulations. *Business Ventures, Inc. v. Iowa City,* 234 N.W.2d 376, 381–82 (Iowa 1975). We have previously observed that:

[A] "taking" does not necessarily mean the appropriation of the fee. It may be anything which substantially deprives one of the use and enjoyment of his property or a portion thereof.... [T]here has been a taking if, as plaintiffs contend, there has been a substantial interference with their use and enjoyment of their property....

*Phelps,* 211 N.W.2d at 276 (citations omitted). Although not every police power regulation that restricts some beneficial use of property creates a compensable taking, *see Stone v. City of Wilton,* 331 N.W.2d 398, 404 (Iowa 1983), the frustration of investment-backed expectations by zoning ordinances may constitute a taking for which compensation is due. *See, e.g., Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980) (application of general zoning law to particular property affects a taking if it denies the economically viable use of the land); *Osborn v. City of Cedar Rapids,* 324 N.W.2d 471, 474 (Iowa 1982) (action taken for public good that places uncompensated burden upon plaintiff's property not shared by public at large may constitute taking); *Woodbury County Soil Conservation Dist. v. Ortner,* 279 N.W.2d 276, 278 (Iowa 1979) (even exercise of police power may amount to taking if it deprives owner of substantial use and enjoyment of property).

Plaintiffs offered the testimony of an expert witness who stated that their property was located in an area where commercial development was taking place. This witness expressed the view that the airport "clear zone" requirement was a detriment to the property's development potential. We believe the substance of that conclusion is to be strongly inferred from the record in the absence of expert testimony.

A loss of development potential may be a significant factor in "taking" claims based on zoning restrictions. *See Lucas,* —— U.S. at ——–——, 112 S.Ct. at 2893–94, 120 L.Ed.2d at 813–14. Absent some physical invasion, however, a taking does not occur until there has been a substantial interference with investment-backed expectations. *Stone,* 331 N.W.2d at 404. There are two principles that we believe affect this determination. First, the court should look at the value of the use remaining rather than the diminution of value of the property. *Penn Cent. Transp. Co.,* 438 U.S. at 130–31, 98 S.Ct. at 2662–63, 57 L.Ed.2d at 552–53.[3] Second,

---

3. We suggested that a regulatory taking may arise from "anything that substantially deprives one of the use and enjoyment of his property or

a portion thereof" in *Phelps,* 211 N.W.2d at 276. That case, however, involved a physical invasion for which the "taking" criteria differ substantial-

" 'taking' jurisprudence does not divide a single parcel into discreet segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Id.*

 In the recent *Lucas* case, the Court again considered whether

the situation [is] one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole.

*Lucas,* —— U.S. at ——, 112 S.Ct. at 2894, 120 L.Ed.2d at 813. The Court suggests that this question turns on how the interest is viewed under state property law. *Id.* Damages for a partial taking under Iowa law are not measured by the value of the portion taken. They are measured by the diminution in value of the original tract. *See Twin–State Eng'g & Chem. Co. v. Iowa State Highway Comm'n,* 197 N.W.2d 575, 577–78 (Iowa 1972); *Powers v. City of Dubuque,* 176 N.W.2d 135, 138 (Iowa 1970). Thus, under state property law, we view the present interference as one in which the owner has suffered a diminution in value of the tract as a whole.

■ In light of the principles just discussed, we conclude that the alleged deprivation in the present case is much less severe than that which was held to be insufficient to support a constitutional taking in *Stone,* 331 N.W.2d at 404. As was the case in *Stone,* these plaintiffs continue to have an economically viable use of their property even though its market value has to some extent been diminished as a result of the airport zoning ordinances. This loss of value is insufficient to support a finding that a regulatory taking has occurred. The court of appeals erred in determining otherwise.

We have considered all issues presented and conclude that the decision of the court of appeals must be vacated and the judgment of the district court affirmed in all respects.

ly from those applicable in regulatory zoning

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.